473 S.E.2d 894

William L. PROVINCE, Plaintiff
Below, Appellee,

v.

Tammy M. PROVINCE, Defendant
Below, Appellant,

and

Michael L. PROVINCE and Linda
D. Province, Intervenors
Below, Appellees,

v.

William L. PROVINCE and Tammy M.
Province, Defendants Below,

Tammy M. Province, Appellant.

No. 22689.

Supreme Court of Appeals of
West Virginia.

Submitted April 23, 1996.

Decided May 17, 1996.

James M. Powell, Hardman & Powell, Parkersburg, for Appellant Tammy M. Province.

Robert S. Fluharty, Fluharty & Townsend, Parkersburg, for Appellees Michael W. Province and Linda D. Province.

CLECKLEY, Justice:

In this divorce proceeding, Tammy M. Province, the defendant below and appellant herein, appeals the order of the Circuit Court of Wood County entered April 15, 1994.[1] In its order, the circuit court adopted the special commissioner's recommended order of December 20, 1993, concerning property distribution. The defendant contends that a 50–acre farm held in trust for her and the plaintiff, together with rental proceeds from a lease agreement on that property should have been included as part of the marital estate for equitable distribution purposes.

---

1. A final order has not yet issued in this case. On, January 25, 1996, the family law master issued an order which states, in part: "The above-styled case was decided on June 28, 1995. On August 30, 1995, Mr. Powell [attorney for the defendant] prepared the Recommended Order and Judgment. To date I have not received these orders."

She maintains this property was conveyed to the plaintiff's brother and sister-in-law in "paper title" only, with the understanding that the conveyance was for the purpose of protecting the property from creditors and the property would be reconveyed to the plaintiff and the defendant when their financial situation improved. The special commissioner refused to hear evidence on this issue presumably because the trust claim was barred by the statute of limitations. The defendant asserts the commissioner erred in refusing to hear this evidence. We agree.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

William Province, the plaintiff below and one of the appellees herein,[2] and Tammy Province were married in 1978 and had two children, Billie Jo Province, born in October, 1978, and Jesse William Province, born in November, 1984. This action arises out of William Province's divorce petition filed in the Circuit Court of Wood County in 1990. The relevant facts are as follows.

In 1980, the plaintiff and defendant purchased a 62–acre farm in Mineral Wells, West Virginia, which is the subject of this appeal. By general warranty deed dated January 7, 1985, the plaintiff and the defendant conveyed fifty acres of that property to Michael and Linda Province, the plaintiff's brother and sister-in-law.[3] Following the conveyance, the plaintiff and the defendant continued to live in their home which was part of the property conveyed, and continued to operate the dairy farm located on the property. On January 22, 1985, the plaintiff and Michael Province entered into a written partnership agreement concerning the farm.

The agreement provided the plaintiff would supply the labor and Michael Province would supply the farm real estate, that being the same property conveyed by the plaintiff and defendant to Michael and Linda Province on January 7, 1985.[4]

On September 19, 1988, the two couples entered into an agreement to lease a 15–acre wood lot on the property to the Mead Corporation. The lease agreement provided that the lessee would pay $12,500 semi-annually to the plaintiff and the defendant, as the "parties in possession." Prior to the filing of the divorce, all lease payments were received by the plaintiff and defendant together.

William Province filed this divorce proceeding in August of 1990. A preliminary order was entered pursuant to a hearing before a family law master on September 25, 1990. Paragraph 11 of that order states: "Except as provided hereinabove, the parties shall each be and they are hereby mutually enjoined and restrained from transferring possession, ownership, or otherwise dissipating, encumbering, or disposing of any of their real or personal assets until further Order of Court." In apparent contravention of that order, the plaintiff used two Mead lease checks, payable on October 1, 1990, and April 1, 1991, to pay one Opal Finch, purportedly as repayment of marital debts.[5]

The defendant subsequently filed a contempt petition complaining, among other things, that the plaintiff had spent these rental proceeds, disposed of other marital property, and failed to pay alimony and child support payments to the defendant.[6] From October 1991 to April 1993, when the lease to the Mead Corporation ended, the semi-annual rental checks were received by Richard Bush, counsel for plaintiff, as escrow agent.[7]

---

**2.** The plaintiff did not file a brief or otherwise appear before this Court.

**3.** Apparently twelve acres of the original 62–acre farm were conveyed to another party.

**4.** The defendant asserts that the parties entered this agreement to shield the plaintiff and defendant from creditors in Ohio, as detailed below.

**5.** On November 8, 1991, a circuit court hearing was held on a contempt petition filed by the defendant. The plaintiff testified he was able to cash the checks by putting the first one in the joint account he shared with his wife and by

signing his wife's name to the second one. The record as presented to us is silent as to whether criminal charges were filed against the plaintiff.

**6.** The circuit court, in its preliminary order of September 25, 1990, ordered the plaintiff to pay $50.00 per week child support and $25.00 per week alimony to the defendant on a temporary basis.

**7.** It is not clear from the record how this arrangement came about. The circuit court did state in its order of January 3, 1992, that the parties had agreed on the plaintiff's attorney as the escrow agent.

The circuit court by order of January 3, 1992, disposed of the contempt issue by ordering that the escrow agent pay to the defendant certain sums owed by the plaintiff, including unpaid alimony and child support.

On January 14, 1992, the plaintiff moved to refer the case to a special commissioner for all further proceedings on the issues of equitable distribution and alimony.[8] On January 21, 1992, Michael and Linda Province filed a motion to intervene arguing they were the owners of the property in question and were entitled to all lease payments on the property after April 1, 1991.[9] Both the plaintiff's motion for reference to a commissioner and the motion to intervene were heard on February 3, 1992, and both were granted by order of the circuit court.

Hearings on equitable distribution and alimony were held before the special commissioner on April 2, 1993; June 21, 1993; and August 30, 1993. No transcript was made of these hearings, but apparently the special commissioner refused to allow the defendant to introduce evidence to show the intervenors held title to the land in trust for the defendant and the plaintiff. On September 8, 1993, the defendant filed a proffer of evidence which was intended to show that the conveyance of the property to the intervenors was made with the understanding that the intervenors were merely "paper title holders" and all subsequent acts of the parties show the actual legal owners of the real estate are the plaintiff and the defendant.[10]

In his recommended order of December 20, 1993, the commissioner said, in pertinent part, that one-half of the rent checks paid to the plaintiff and defendant by the Mead Corporation prior to the divorce was credited to the intervenors' "obligation" to the plaintiff and defendant. He further found that each of the two couples have a vested interest in and own 50 percent of the lease proceeds paid subsequent to the filing of the divorce and, therefore, half of those proceeds was a marital asset of the plaintiff and defendant. The basis for the commissioner's findings was that the dissolution of the partnership

8. A hearing was held before the family law master on December 3, 1991. On January 14, 1992, the plaintiff filed a motion for reference to a commissioner. In his motion, the plaintiff stated the child support award would be based, in major part, upon a determination of whether the lease payment "made to the Plaintiff" was characterized as a marital asset or income. He further stated the issue of the equitable distribution of the marital assets and liabilities of the parties was a complex one, and the family law master had indicated she was "unable and/or unwilling to devote large blocks of in-court time" to the issue. We decline to address these issues further as they are not presented on appeal.

9. The intervenors did not state why they should receive all the rental proceeds paid after April, 1991. However, in his recommended order, the special commissioner indicated the reason was due to the dissolution in early 1991 of the partnership between the plaintiff and the intervenor Michael Province. The commissioner noted that both the plaintiff and Michael Province testified the Mead lease was considered part of the operation of the farm partnership originally formed on January 22, 1985.

10. We note that the defendant asserts, in part: (1) the plaintiff and the defendant continued to reside on the real estate, to operate the dairy farm thereon, and to pay no rent to the intervenors; (2) the intervenors paid rent to the plaintiff and defendant for the house in which they resided, which was located on the property conveyed to the intervenors; (3) the plaintiff and defendant made payments on the deed of trust against the real estate; (4) the agreement leasing a wood lot on the property provided the lessee would pay the plaintiff and defendant and this income was reported on their income tax return; (5) the plaintiff and intervenors made statements that the property belonged to the plaintiff and defendant and would be reconveyed to them when their financial problems were solved; (6) the checking account relating to the dairy farm operation was controlled by the plaintiff and defendant after the conveyance; (7) the plaintiff and defendant paid the taxes on the real estate after they conveyed it to the intervenors; (8) the attorney for the plaintiff and defendant at the time of the conveyance stated at that time that the conveyance was for the purpose of protecting the property for the plaintiff and defendant in the event creditors from their previous Ohio farm operation attempted to attach or force a sale of the Mineral Wells dairy farm.

(The record indicates the plaintiff and defendant bought a dairy farm in Waterford, Ohio in 1982, and moved there to conduct the farm operation. The purchase was financed with mortgages from Farmers' Home Administration and a Joseph Detweiler. When the farm proved unprofitable, the plaintiff and defendant moved back to their dairy farm in Mineral Wells, West Virginia, in 1984. On June 7, 1985, the Court of Common Pleas of Washington County, Ohio, issued a default judgment to Joseph Detweiler against William and Tammy Province for $50,437.)

between Michael Province and the plaintiff should not operate to the detriment of the defendant, who had a vested interest in a portion of the lease proceeds, but had no control over the dissolution of the partnership. The special commissioner held the defendant's claim for reconveyance was barred by the statute of limitations.

By order entered April 15, 1994, the circuit court adopted the findings of fact and conclusions of law of the special commissioner and granted the plaintiff and defendant a divorce. The defendant challenges the special commissioner's conclusion that her claim for reconveyance of the trust property is time barred. We will address her contentions below.

## II.

## DISCUSSION

The question raised on this appeal is whether the lower tribunals committed error by excluding evidence regarding the establishment of a trust in the property conveyed to the intervenors by the plaintiff and the defendant. In determining whether this evidence was probative of any fact of consequence, we must address whether the claim of the defendant, Tammy M. Province, was barred by the statute of limitations or by the provisions of W. Va. Code, 36–1–4 (1931). Our review of the record shows that the evidence was wrongfully excluded. Thus, we remand this case with specific instructions.

## A.

## APPELLATE JURISDICTION

■ There is a threshold problem. The parties assume we have jurisdiction to hear the appeal from the April 15, 1994 order of the circuit court regarding equitable distribution. *See* Note 1, *supra*. Although our conclusion is by no means obvious, we hold, as have other decisions of this Court, that we do have jurisdiction under these peculiar circumstances. "Under W. Va.Code, 58–5–1 (1925), appeals only may be taken from final decisions of a circuit court. *Parkway Fuel*

*Service, Inc. v. Pauley,* 159 W.Va. 216, 219, 220 S.E.2d 439, 441 (1975)." *James M.B. v. Carolyn M.,* 193 W.Va. 289, 292, 456 S.E.2d 16, 19 (1995). The required finality is a statutory mandate, not a rule of discretion. In *James M.B.,* we stated a decision is final for purposes of our statute if it ends the litigation on the merits and leaves nothing for the circuit court to do but execute the judgment. 193 W.Va. at 292, 456 S.E.2d at 19. Still pending in the lower court is the part of this proceeding dealing with child support and other matters that were not assigned to the special commissioner. In other words, none of the circuit court's decisions in the April 15, 1994 order relates to child support. Under these circumstances, the best that can be argued is that we have appellate jurisdiction under a liberal reading of W.Va.R.Civ.P. 54(b), which provides in pertinent part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.[11]

Even if we were to assume that the mandates of Rule 54(b) have been met, a circuit court's determinations, which directly affect the scope of our appellate jurisdiction are not conclusive on us. *See James M.B. v. Carolyn M., supra.* Instead, we review such determinations to see if they fit within the scope of the rule. *See Braswell Shipyards, Inc. v. Beazer East, Inc.,* 2 F.3d 1331, 1336 (4th Cir.1993).

■ We apply a two-prong test to review a circuit court's Rule 54(b) certification. *Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1, 12 (1980). First, we scrutinize the circuit court's evaluation of the interrelationship of the claims, in order to decide whether the circuit court completely disposed

11. Rule 54(b) permits entry of a final judgment as to fewer than all claims or parties upon an express determination that there is "no just reason for delay" in entering judgment. Although no party has challenged jurisdiction under Rule 54(b), neither party has argued the affirmative that we have jurisdiction under Rule 54(b). We are duty bound to take up the jurisdictional issue *sua sponte,* because it implicates the scope of our appellate jurisdiction.

of one or more claims, which is a prerequisite for an appeal under this rule.[12] Our scrutiny under this first prong approaches *de novo* review, because we have a duty to ensure the limits in our jurisdiction are observed; however, there is some room for deference particularly where the circuit court has made its reasoning clear. *See Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. at 1466, 64 L.Ed.2d at 12–13 (proper role of appellate court is to ensure that the circuit court's rule 54(b) related conclusion and assessment are judicially sound and supported by the record).

■ Certification should not, however, be routinely granted in any event. *See Curtiss–Wright*, 446 U.S. at 8, 100 S.Ct. at 1465, 64 L.Ed.2d at 11 ("Not all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims"). It should be granted only if there exists some danger of hardship or injustice through delay, that would be alleviated by immediate appeal. To be clear, the purpose of Rule 54(b) is to codify the historic practice of "prohibit[ing] piecemeal disposal of litigation and permitt[ing] appeals only from final judgments," except in the "infrequent harsh case" in which the circuit court properly makes the determinations contemplated by the rule. Fed.R.Civ.P. 54(b) advisory committee's note to 1946 amendment.

■ Here, we have no concern with whether the circuit court has disposed entirely of one or more claims. Claims are separable when there is more than one possible recovery, 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2657 at 67 (2d ed. 1983), or if "different sorts of relief" are sought, *see*

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 580–81 & n. 18, 100 S.Ct. 800, 805–06 & n. 18, 63 L.Ed.2d 36, 44–45 & n. 18 (1980). When either of these circumstances exists, claims are "separately enforceable" and subject to Rule 54(b) certification even if they arise out of a single transaction or occurrence.[13] A fair review of the record reveals that the claims of equitable distribution and child support were bifurcated once the circuit court granted the parties' request for a special commissioner. What is being appealed are claims dealing only with equitable distribution. Thus, the first prong has been satisfied.

As to the second prong of the inquiry under the rule—whether there is any just reason for delay—we accord the circuit court's determination considerably more deference than we do its first-prong determination. *Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. at 1466, 64 L.Ed.2d at 12–13. We will not disturb the circuit court's assessment that there is "no just reason for delay" unless the court's conclusion was clearly unreasonable, because "the task of weighing and balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case." *Curtiss–Wright*, 446 U.S. at 12, 100 S.Ct. at 1467, 64 L.Ed.2d at 14.

■ Under the second prong, we must examine the circuit court's assessments of (1) any interrelationship or overlap among the various legal and factual issues involved in the decided and pending claims, and (2) any equities and efficiencies implicated by the requested piecemeal review. In reviewing the second prong, we do not have the benefit of the circuit court's reasoning.[14] Ordinarily,

---

**12.** A judgment properly may be certified under Rule 54(b) only if it possesses the requisite degree of finality. That is, the judgment must completely dispose of at least one substantive claim. A partial or interlocutory adjudication of a claim cannot be certified merely because it is labelled a "partial final judgment," "partial summary judgment" or labelled a 12(b)(6) dismissal, even if the requisite express determination has been made.

**13.** *See Cold Metal Process Co. v. United Engineering & Foundry Co.*, 351 U.S. 445, 452, 76 S.Ct. 904, 908, 100 L.Ed. 1311, 1318 (1956); *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436–37

& n. 9, 76 S.Ct. 895, 900–01 & n. 9, 100 L.Ed. 1297, 1306–07 & n. 9 (1956).

**14.** In its critical role as Rule 54(b) dispatcher, the circuit court is to consider the strong judicial policy disfavoring piecemeal appellate review by carefully comparing the claims that have been disposed of and the unadjudicated claims for indications of substantial overlap—to ensure that this Court is not confronted in successive appeals with common issues of law or fact to the detriment of judicial efficiency.

When the circuit court provides a sufficient written statement of the grounds for certification, as it should, we normally accord its discretionary

an appellate court cannot properly evaluate this prong without knowing how the circuit court feels about separating these issues for appellate purposes. Indeed, the entire purpose of Rule 54(b) is to place this decision in the hands of the trial court who can best make this delicate balance. As a practical matter, we have gone as far as an appellate court should go in allowing appeals under Rule 54(b) where there was no express certification by the circuit court. *See State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 775, 461 S.E.2d 516, 521 (1995); *Sisson v. Seneca Mental Health/ Mental Retardation Council, Inc.,* 185 W.Va. 33, 404 S.E.2d 425 (1991); *Durm v. Heck's, Inc.,* 184 W.Va. 562, 401 S.E.2d 908 (1991). The caseload of this Court has grown faster than any other component of the West Virginia judiciary. A more liberal construction of Rule 54(b) has a tremendous potential to increase our caseload still more rapidly, because of the rule's natural tendencies to multiply appeals in a single case. This case is a good example: even if we were to decide each of the issues raised in the present appeal, we are quite likely to have to decide one or more additional appeals in this case in the future.[15] Although it might be easier to decide each appeal in a series of multiple appeals in the same case than would be an appeal from a final judgment disposing of the entire lawsuit, the greater simplicity will usually be outweighed by the burden on this Court of having to reacquaint itself again and again with at least the basic facts of the case. Thus, in reviewing disputed or questionable Rule 54(b) certifications, we will keep in mind the purpose and practical implications of the rule.

 To be sure, this is not an ordinary case. It involves the bifurcation of distinct issues that was necessitated by the appointment of a special commissioner to handle only one of the equitable distribution issues. The remaining issues were to be decided by the family law master. The special commissioner promptly heard the evidence, prepared his report and filed it with the circuit court. It is quite apparent from the order entered by the circuit court that the court felt it was making a final ruling on equitable distribution and treated it like any other final order. *See Strahin v. Lantz,* 193 W.Va. 285, 286 n. 1, 456 S.E.2d 12, 13 n. 1 (1995) (in "[a]ddressing the finality requirement, we adopt a practical interpretation that looks to the intention of the circuit court"). More significantly, the real parties in interest to this appeal are different from those in the proceedings before the family law master. Here, the real appellees are the intervenors who are attempting to protect their claim to property rights. In one sense, the issue on appeal is unaffected by any rulings made by the family law master concerning child support. On the other hand, the finality of the ruling on equitable distribution may have some impact on child support. Because the case could have been properly certified under Rule 54(b) and the issue we are asked to review is one of clear error requiring a remand for further proceedings, we reluctantly proceed to decide this aberrational case on the merits. We think it is clear that the circuit court took the action it did to make clear that the decision was a final and immediately appealable order. "[T]he key to determining if an order is final is not whether Rule 54(b) language is included in the order, but is whether the order 'approximates a final order in its nature and effect.'" *State ex rel. McGraw v. Scott Runyan Pontiac– Buick, Inc.,* 194 W.Va. 770, 775, 461 S.E.2d 516, 521 (1995), *quoting* Syllabus Point 2, *Durm v. Heck's, Inc.,* 184 W.Va. 562, 401 S.E.2d 908 (1991).[16] We believe this standard has been satisfied.

decision substantial deference and will refuse an appeal for lack of jurisdiction only if the court's certification was clearly unreasonable. *See Curtiss–Wright,* 446 U.S. at 10, 100 S.Ct. at 1466 ("once such juridical concerns have been met, the discretionary judgment of the [circuit] court should be given substantial deference.")

15. Subsequent circuit court proceedings could very well render superfluous whatever interim appellate resolution might be predicated on this fragile hypothetical foundation, and this Court could be required to revisit the very facts of this case again. Such piecemeal appellate exercises sacrifice judicial efficiency and risk serious, unintended *res judicata* effects.

16. The preferable approach for any litigant who expects to appeal interlocutory less than all the issues in an action is to request a certification order as required by Rule 54(b). If the circuit court is persuaded that Rule 54(b) is appropriate, the circuit court should support its conclusion by clearly and cogently expressing its reasoning and the factual and legal determinations supporting

Although we have chosen not to detour around this Serbonian bog, our decision to exercise appellate jurisdiction is buttressed by the familiar tenet that when an appeal presents a jurisdictional quandry, yet the merits of the underlying issue, if reached, will in any event do no harm to the party challenging jurisdiction, then the court may forsake the jurisdictional riddle and simply dispose of the case on the merits. *See Norton v. Mathews*, 427 U.S. 524, 530–31, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976); *Secretary of Navy v. Avrech*, 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3039–40, 41 L.Ed.2d 1033 (1974). Neither party challenges jurisdiction in this case. Our decision to remand the case for further factual development does not ultimately harm either side. Thus, to a large extent we leave for another day just what limits we place on Rule 54(b) where there is no express certification by the circuit court and the continuing vitality of our trilogy of cases (*McGraw, Sisson,* and *Durm* ).

### B.

### STANDARD OF REVIEW

The issue on appeal arises from a ruling by a special commissioner. For purposes of appellate review, his opinion will be treated like that of a family law master. *See Banker v. Banker*, 196 W.Va. 535, 474 S.E.2d 465 (1996). We apply a three-step standard of review in domestic relations cases. Syllabus Point 1 of *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995), sets forth the standard of review this Court should employ when examining challenges to a decision of the circuit court which adopts the findings of a family law master and, by extension in this case, a special commissioner:

> "In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review."

Rulings of a special commissioner involving a mixture of law and fact are reviewed under an abuse of discretion standard. Ordinarily, this would include the rulings excluding evidence. *See State v. Louk,* 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983); Syl. Pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983). However, the extent to which the ruling turns on materiality or interpretation of our law, the standard of appellate review is plenary. *See State v. Sutphin,* 195 W.Va. 551, 466 S.E.2d 402 (1995). Because the determinative questions on appeal involve issues of law, we conduct a *de novo* review.

### C.

### ANALYSIS

Essentially, both the special commissioner and the circuit court determined that evidence regarding the establishment of a trust in the property conveyed to the intervenors by the plaintiff and the defendant should be excluded as immaterial. Our review of this evidentiary ruling is controlled by Rules 401 and 402 of the West Virginia Rules of Evidence. Rule 402 provides in pertinent part that "[a]ll relevant evidence is admissible, except as otherwise provided ..." by our constitutions or other rules of this Court. More significantly, Rule 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of *any fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence." (emphasis added). The rulings of the lower tribunal could conceivably be premised on two separate grounds, *i.e.,* statute of limitations or the provisions of W. Va.Code, 36–1–4 (1931) (fraudulent conveyances). Of course, if the claim upon which the evidence was proffered is barred by either statute, the evidence was properly ex-

---

that reasoning. *Cf. Explosives Supply Co., Inc. v. Columbia Nitrogen Corp.,* 691 F.2d 486 (11th Cir.1982) (a district court is not required, in every case, to express its reasoning, although "the desirability of such a statement of reasons is obvious since such an explanation would assist appellate courts in reviewing district court decisions").

cluded as not being "a fact of consequence." *See* Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 4–1(C), pg. 201 (1994) (under W.Va.R.Evid. 401, relevancy exists only as a relationship between an item of evidence and a matter properly provable in a case).

First, we address the statute of limitations. Statutes of limitations "represent a pervasive legislative judgment ... that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 357, 62 L.Ed.2d 259, 266 (1979), *quoting Order of Railroad Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788, 792 (1944); *Donley v. Bracken,* 192 W.Va. 383, 387, 452 S.E.2d 699, 703 (1994). Because statutes of limitations are themselves expressions of important legislative policies, they should not be judicially abrogated without due consideration of those policies. Of course, like all general rules, statutes of limitations have numerous statutory and common law exceptions. One exception that profoundly impacts a strict and literal application of the statute is a matter exclusively of an equitable nature. *See West Virginia Human Rights Commission v. Garretson,* 196 W.Va. 118 n. 8, 468 S.E.2d 733 n. 8 (1996) (suggesting that in matters of equity "[o]ther time restraints may be relevant in determining the extent to which a claimant is entitled to equitable remedies").

Because this claim is in equity, the statute of limitations may not apply. Syllabus Point 3 of *Rodgers v. Rodgers,* 184 W.Va. 82, 399 S.E.2d 664 (1990), states: "'Statutes of limitations are not applicable in equity to subjects of exclusively equitable cognizance. Matters pertaining to fiduciary relationships come within the rule.' Syllabus Point 3, *Felsenheld v. Bloch Bros. Tobacco Co.,* 119 W.Va. 167, 192 S.E. 545, 123 A.L.R. 334 (1937)." While there is a substantial conflict among jurisdictions, in absence of a specific statute of limitations, West Virginia firmly is committed to the rule that statutes of limitations do not apply to claims exclusively of an equitable nature. *Depue v. Miller,* 65 W.Va. 120, 64 S.E. 740 (1909). It is unquestionable that a constructive or resulting trust is a typical remedy available in equity. Thus, the equitable doctrine that permits a resulting or constructive trust,[17] when properly invoked, estops the opposition from relying on a general statute of limitations as an affirmative defense.

The difficulty with the ruling made below on this issue is that the special commissioner failed to make specific, nonconclusory factual and legal findings in accordance with our directive in prior cases. *See Burnside v. Burnside,* 194 W.Va. 263, 275, 460 S.E.2d 264, 276; *Whiting v. Whiting,* 183 W.Va. 451, 456, 396 S.E.2d 413, 418 (1990); W. Va.Code, 48–2–32(f)(1984). Indeed, we are not told what specific statute of limitations was applied in this case.[18] Our di-

17. A constructive trust is an implied trust and arises by operation of law when equity so demands.

18. The intervenors posit that the special commissioner relied on West Virginia Code, 48–2–33(f)(3)(1993), which states, in part:

"(3) Any assets with a fair market value of five hundred dollars or more which would be considered part of the estate of either or both of the parties if owned by either or both of them at the time of the action, but which was transferred for inadequate consideration, wasted, given away or otherwise unaccounted for by one of the parties, within five years prior to the filing of the petition or length of the marriage, whichever is shorter, shall be presumed to be part of the estate and shall be subject to the disclosure requirement contained in this section. With respect to such transfers the spouse shall have the same right

and remedies as a creditor whose debt was contracted at the time the transfer was made under article one-a [§ 40–1A–1 et seq.], chapter forty of this code."

Although this statute has a time period, it is not a statute of limitations. It creates a *presumption* that transfers without adequate consideration, if conveyed within five years or the length of the marriage, is marital property subject to equitable distribution. Moreover, the defendant does not rely upon this provision to recover the property in question. She contends that her right to have property brought back into the marital estate arises out of our common law in equity. Furthermore, this statute does not preclude the defendant from seeking equitable relief to have the property included in equitable distribution. It merely denies her the benefit of the presumption. To the extent the special commissioner relied upon this statute as "the statute of limitations," we find he erred as a matter of law.

rective serves to (1) engender care on the part of the family law master (special commissioner) in ascertaining the facts and law; and (2) make possible meaningful appellate review. To be clear, being explicit about its reasoning not only assists the hearing tribunal itself in analyzing legal claims and the equities of the situation, but also facilitates appellate review of matters affecting equitable distribution. The touchstone for whether the family law master has satisfied our directives is whether he or she has supported his or her conclusion by clearly and cogently expressing his or her reasoning and the factual and legal determinations supporting that reasoning. The order must be sufficient to indicate the factual and legal basis for the family law master's ultimate conclusion so as to facilitate a meaningful review of the issues presented. Where the lower tribunals fail to meet this standard—i.e. making only general, conclusory or inexact findings—we must vacate the judgment and remand the case for further findings and development.[19]

We are sensitive to the burdens placed on family law masters,[20] but they have an experiential advantage over this Court in parsing out claims and defenses. If the family law master does not explain himself, as is the case here, we do not get the benefit of his experience and reasoning. In such a case, any deference we might otherwise accord such a ruling will be nullified by the absence of a meaningful explanation. In the instant case, we cannot meaningfully review the special commissioner's legal and factual ruling regarding the statute of limitations because the findings and legal conclusions (1) do not explain why the statute of limitations is even applicable to a matter that is presumptively equitable in nature; (2) do not explicitly explain which statute of limitations was relied upon; and (3) do not explain or set forth the essential subsidiary facts necessary to sup-

port his conclusion concerning defendant's lack of compliance with the statute of limitations.

Although the statute of limitations may be inapplicable, the facts of this case may give rise to other defenses in bar, i.e., laches[21] and the "clean hands" doctrine. First, "[a]s this Court has suggested many times, laches is an equitable doctrine based on the maxim that equity aids the vigilant, not those who slumber on their rights. *Puleio v. Vose*, 830 F.2d 1197 (1st Cir.1987). *See* Syllabus Pt. 2, *Phillips v. Piney Coal & Coke Co.*, 53 W.Va. 543, 44 S.E. 774 (1903) ('A court of equity will not assist one who has slept upon his [her] rights and shows no excuse for his *laches* in asserting them')." *Banker v. Banker*, 196 W.Va. 535, 474 S.E.2d 465 (1996). *See also Whitney v. Fox*, 166 U.S. 637, 17 S.Ct. 713, 41 L.Ed. 1145 (1897) (sustaining the defense of laches in a suit to establish the existence of a trust in plaintiff's favor).

The elements of laches consist of (1) unreasonable delay and (2) prejudice. *See State, Dept. of Health and Human Resources, Child Advocate Office on Behalf of Robert Michael B. v. Robert Morris N.*, 195 W.Va. 759, 466 S.E.2d 827 (1995). Specifically, the Court stated:

"Mere delay will not bar relief in equity on the ground of laches. 'Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right.'" Syllabus Point 2, *Bank of Marlinton v. McLaughlin*, 123 W.Va. 608, 17 S.E.2d 213 (1941).

Even though a finding of laches rests primarily within the discretion of the special commissioner and circuit court, we will not approve such finding if the party asserting the defense fails to prove prejudice.

19. In order to satisfy the adequate findings requirement, the family law master must include as many of the subsidiary facts as necessary to permit us to determine the steps by which it reached its ultimate conclusion. Where we are provided only legal conclusions unsupported by specific facts or by an explanation of the court's reasoning with respect to the ultimate conclusion, a reviewing court simply is unable to determine whether or not the conclusion is an abuse of discretion.

20. *See State v. Buzzard*, 194 W.Va. 544, 553, 461 S.E.2d 50, 59 (1995) (dissenting opinion of Judge Fox).

21. As discussed in the main text, laches is an equitable remedy that prevents a party from asserting a claim due to a lapse of time. Although the doctrine of laches is not bound by any statute of limitations, the statute of limitations is one measure of whether a claim has become stale. Laches and statutes of limitations are analogs.

The burden of proving unreasonable delay and prejudice is upon the litigant seeking relief. No rigid rule can be laid down as to what delay will constitute prejudice; every claim must depend upon its own circumstances. To be clear, the plea of laches cannot be sustained unless facts are alleged to show prejudice to the opposing party, or that the ascertainment of the truth is made more difficult by the delay in seeking immediate relief.

■ For purposes of remand, however, we note that relief in equity may yet be denied on the ground of a plaintiff's laches even when a statute of limitations is not a bar. The doctrine of laches may apply in equity, whether or not a statute of limitations also applies and whether or not an applicable statute of limitations has been satisfied. *See* 27 Am.Jur.2d *Equity* § 157, at 693 (1966). That question will require resolution by the trial court.

■ Next, the appellees, the intervenors below, audaciously contend that even if the special commissioner was wrong as to the applicability of the statute of limitations, the evidence was excluded properly on other grounds. Specifically, the appellees argue that the lower tribunals were correct in not allowing the introduction of evidence to support a claim of trust because, by the appellant's own admission, the conveyance was made to avoid creditors and was therefore fraudulent. Accordingly, the appellees invoke the equitable maxim that a party who seeks equity must come with clean hands. "Equity never helps those who engage in

fraudulent transactions, but leave them where it finds them." *Moore v. Mustoe,* 47 W.Va. 549, 552, 35 S.E. 871, 873 (1900). This doctrine has been expressly and specifically made a part of the organic law in this State. Thus, the intervenors partially are correct that the provision of W. Va.Code, 36–1–4 (1931), relied upon by the defendant is inapplicable to fraudulent conveyances.[22] However, we have held previously that the fraud contemplated in these situations is fraud in the conveyance itself. In Syllabus Point 3 of *Hoglund v. Curtis,* 134 W.Va. 735, 61 S.E.2d 642 (1950), we stated:

"Where, under Code, 36–1–4, a grantor in a conveyance, absolute on its face, seeks to establish a trust imposing on the grantee the duty to reconvey the property conveyed; the grantee seeks to interpose the defense of fraud as a bar to the establishment of a trust, such fraud to be effective as a basis of defense must permeate the conveyance itself and the concomitant promise to reconvey. Fraud, not entering into the conveyance itself, on which conveyance the grantor relies to establish a trust by parol evidence under Code, 36–1–4, will not serve to vitiate a trust in favor of a grantor in the conveyance, which has been established by competent parol testimony so clear that no doubt can exist that the parties intended to establish a trust in grantor's favor."

In the *Hoglund* case, the plaintiff testified that the conveyance was a "pretended contract" and that he signed it for the purpose of saving his property.[23] On the scant record before us, we find that W. Va.Code, 36–1–4,

---

**22.** W. Va.Code, 36–1–4, states:

"No declaration of trust of land shall be enforceable, unless it be made in writing, signed by the person who declares such trust or by his agent. If a conveyance of land, not fraudulent, is made to one in trust either for the grantor or a third person, such trust may be enforced, though it be not disclosed on the face of the conveyance, nor evidenced by a writing: Provided, however, that trusts arising by construction or operation of law shall not be subject to the provisions of this section."

**23.** The plaintiff in *Hoglund* conveyed the property to the defendant with the understanding that it would be reconveyed to the plaintiff. The reason for the conveyance was to aid the plaintiff in acquiring an FHA loan to construct a house. The FHA had made a commitment to loan funds to the plaintiff, but revoked that commitment

when the plaintiff was inducted into the army. The defendant agreed to acquire a loan for the plaintiff after the plaintiff conveyed the property to the defendant in trust. The Court found this was not the kind of fraud which would bar the plaintiff in a court of equity from establishing a parol trust in his favor under W. Va.Code, 36–1–4. The Court was of the opinion that "whatever fraud there was, it did not enter into the promise sought to be enforced," *Hoglund v. Curtis,* 134 W.Va. at 750, 61 S.E.2d at 651, and that "[a] reading of Code, 36–1–4, serves to show that the fraud contemplated by the Legislature in the enactment of the statute must be in the conveyance itself on the basis of which a trust is sought to be established." 134 W.Va. at 749, 61 S.E.2d at 650.

does not bar the granting of a resulting or constructive trust because there is no evidence of fraud in the conveyance.

Nevertheless, a court could find the "lack of clean hands" bars equitable relief even independently of the statute, In Syllabus Point 2 of *Bailey v. Banther*, 173 W.Va. 220, 314 S.E.2d 176 (1983), we held as follows:

> "Courts are reluctant to decree trusts in favor of parties who transferred property to avoid creditors or liabilities. However, if those creditors or liabilities are nonexistent, imaginary or unproved, a grantor can enforce a constructive or resulting trust against his grantee."

Again, the record is insufficient to permit meaningful appellate review as to the more general application of the "clean hands" doctrine. Additionally, the string of cases in *Bailey* cited in support of its holding includes cases which stand for the proposition that the conveyance of a homestead to avoid creditors cannot be a fraudulent conveyance because a homestead is not subject to claims of creditors.[24] *Bailey*, 173 W.Va. at 223–24, 314 S.E.2d at 180. It is possible that at least a portion of the property in this case may fit within the homestead exception to the "clean hands" rule if, indeed, the evidence shows a trust was established in favor of the plaintiff and defendant. The determinative equity-based principles at work here are highly fact-sensitive that require a full hearing of the evidence on the issue. It would be extremely difficult for the special commissioner to understand the entire transaction without all evidence of the negotiations and maneuverings. Accordingly, we find the special commissioner abused his discretion in not allowing evidence on the issue of whether a trust in land was created in favor of the plaintiff and defendant.

## III.

## CONCLUSION

Because the special commissioner's order (and the circuit court) failed to make the specific and clear findings required, we are unable to determine whether the court correctly applied the statute of limitations. Thus, we vacate the judgment of the circuit court and remand this case for further proceedings. On remand, the special commissioner, after allowing the parties to present evidence concerning the creation of a trust for the benefit of the plaintiff and defendant and held by the intervenors, should then make specific findings and conclusions of law as required by this opinion.

Reversed and remanded.

24. *"Bobier v. Horn*, 95 Okl. 8, 222 P. 238 (1923) (dictum—even though this grantor conveyed to his son to avoid suit on a promissory note, the land was grantor's homestead and not subject to his debts, so its conveyance was not in fraud of creditors); *Evans v. Evans*, 180 Okl. 46, 67 P.2d 779 (1937) (the conveyance of a homestead to a son to avoid creditors cannot be a fraudulent conveyance because a homestead is not subject to claims of creditors—the unclean hands doctrine has no application); ... *Cowles v. Cowles*, 89 Neb. 327, 131 N.W. 738 (1911) (a plaintiff got back property that he transferred to his mother to avoid payment of a judgment because it was his homestead and exempt from lien); ... *Rossow v. Peters*, 277 Ill. 436, 115 N.E. 524 (1917) (plaintiff was permitted to recover land deeded to his son-in-law to avoid creditors because it was his homestead and statutorily exempt from creditors' claims); ... *Wantulok v. Wantulok*, 67 Wyo. 22, 214 P.2d 477, 21 A.L.R.2d 572, reh. denied, 67 Wyo. 22, 223 P.2d 1030, 21 A.L.R.2d 572 (1950) (a grantor's estate was entitled to property he conveyed to another to avoid purported indebtedness because it was his homestead and exempt)." *Bailey*, 173 W.Va. at 223–224, 314 S.E.2d at 179.